*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

Nos. 12-PR-436 and 12-PR-1582

IN RE EDWARD T. SMITH;

BRUCE E. GARDNER, APPELLANT.

Appeals from the Superior Court
of the District of Columbia
(CON-101-58)

(Hon. Peter H. Wolf, Trial Judge)
(Hon. Ronald P. Wertheim, Trial Judge)

(Submitted June 4, 2013      Decided September 18, 2014)

*Bruce E. Gardner*, pro se.

*Irvin B. Nathan*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General, *Donna M. Murasky*, Deputy Solicitor General, and *Stacy L. Anderson*, Senior Assistant Attorney General, were on the brief for the District of Columbia.

Before FISHER and EASTERLY, *Associate Judges*, and FARRELL, *Senior Judge*.

FISHER, *Associate Judge*: Appellant Bruce E. Gardner challenges the denial of his requests for compensation, claiming that because he was appointed as "conservator" of Edward T. Smith after D.C. Code § 21-1501 had been repealed and because he performed the duties of a guardian and conservator as described in

D.C. Code §§ 21-2047 and 21-2070 (the Guardianship Act), he is eligible to receive compensation from the Guardianship Fund. We conclude that Mr. Gardner is not eligible to receive compensation from the Guardianship Fund for services rendered under his original appointment in 1998, but he is eligible to receive compensation from the Fund in connection with his 2010 appointment as conservator of the person.

## I. Background

The underlying case has a long and confusing procedural history which began in 1958; Mr. Smith died in 2013. During the intervening years, the governing statutes were repealed and superseded, and it is fair to say that the transition to the new law did not occur seamlessly. At times, it appears, titles given to the fiduciary were not used with precision. Nevertheless, the various trial judges and Mr. Gardner acted in good faith to provide the services Mr. Smith needed.

### A. Mr. Smith's Civil Commitment in 1958

In January 1958 a petition for the civil commitment of Mr. Smith was filed in the United States District Court for the District of Columbia.  After holding a hearing and considering affidavits from persons familiar with Mr. Smith, and taking into account the recommendations of physicians and the Commission on Mental Health, the court found that Mr. Smith was of "unsound mind and in need of treatment in a hospital for his mental condition."  *See* D.C. Code §§ 21-301 to -333 (1951) (repealed); *see also United States v. Snyder*, 689 F.2d 1067, 1076 (D.C. Cir. 1982) ("Under the statutory scheme existing at the time, a decree of 'unsound mind' was synonymous with a determination of insanity.").  The court ordered that Mr. Smith be committed to Saint Elizabeths Hospital "until he may be safely discharged therefrom, or transferred to a veterans facility."  Hoping to recover some of the costs of care and treatment from Mr. Smith's estate, the District of

Columbia petitioned for the appointment of a "committee."[1] The court appointed

John B. Perna as "committee of the person and estate of Edward T. Smith."[2]

In 1962 Mr. Smith was transferred to a veterans' hospital in New Jersey, but Mr. Perna continued to serve as committee. In 1972, following court reorganization, the case was transferred from the District Court to the Superior Court of the District of Columbia. The same year, Mr. Smith absconded from the veterans' hospital in New Jersey. He was located at the Promenade Hotel for Adults in New York three years later. Shortly thereafter, he was moved to Pilgrim Psychiatric Center, a New York State mental hospital, and was eventually relocated to an extended care facility in New York. The record makes clear that

---

[1] In this context, a "committee" is the "person or persons who are invested, by order of the proper court, with the guardianship of the person and estate of one who has been adjudged a lunatic." *Black's Law Dictionary*, 342 (4th ed. 1968). The statute in effect at that time provided that the court had "full power and authority to superintend and direct the affairs of persons non compos mentis . . . and to make such orders and decrees for the care of their persons . . . as to the court may seem proper." D.C. Code § 21-301 (1951) (repealed). The court also had the authority to appoint a committee to "account for all profit and increase of the estate of such person and the annual value thereof." *Id.*

[2] Mr. Perna was not, and apparently could not have been, appointed as Mr. Smith's guardian or conservator under the statutes as then written. Guardians were generally only available to infants and minors, and conservators were only available to those with "mental weakness (not amounting to unsoundness of mind)." D.C. Code §§ 21-101 to -130 (1951), -501 (1958 Supp.).

Mr. Perna made arrangements for Mr. Smith's welfare, and did much more than simply account for the receipts and expenses of his estate.

Mr. Perna continued to serve until 1997, when he was "hospitalized and . . . unable to perform his duties as committee." As a result, the Superior Court appointed Cheryl Mout Taylor as "[c]onservator of the person and estate of Edward T. Smith" on October 27, 1997. The court did not cite the statutory authority for the appointment. In 1964, the law which authorized Mr. Perna's appointment as committee had been repealed by the District of Columbia Hospitalization of the Mentally Ill Act, Pub. L. No. 88-597, 78 Stat. 944 (1964) (popularly known as "the Ervin Act"), and a few years later, the new statute was amended. However, each of these legislative actions included a savings clause which will be discussed in more detail below.

When Congress repealed the statute which authorized the appointment of a committee, it also amended the conservatorship statutes. *See* D.C. Code §§ 21-1501 to -1507 (1967). But these new conservatorship statutes in Chapter 15 only applied to those with "mental weakness not amounting to unsoundness of mind." D.C. Code § 21-1501. In 1981, the Code was again amended, but the laws governing committees, conservators, and guardians remained essentially

unaffected; rather, the relevant changes reflected the reorganization of the courts. *See, e.g.*, D.C. Code § 21-564 (b) (1981) (changing supervision from the District Court to the Superior Court). Then, in 1987, the Guardianship Act was enacted, repealing the statutes in Chapter 15 which governed conservatorships. D.C. Code §§ 21-2001 to -2085. Its purpose was to "establish a comprehensive system of guardianship and conservatorship proceedings to deal with a wide range of legal problems which arise from varying degrees of adult physical and mental incapacity." Report of the Council, Committee on the Judiciary, on Bill 6-7, at 2 (June 18, 1986). Among other things, the Guardianship Act "separates the concepts of property and personal management and establishes a range of alternatives for each." *Id*. at 3.

## B. Mr. Gardner's 1998 Appointment

In April 1998 Ms. Taylor's appointment was vacated because she failed to post the required surety, and on May 4, 1998, Judge Haywood appointed Bruce E. Gardner as "conservator of Edward T. Smith, adult ward." This order was issued by handwriting "Bruce E. Gardner, Esq." and "conservator" into blanks provided on a preprinted form, but it did not identify the source of the court's authority to make the appointment. The corresponding Certificate of Appointment, issued by

the Register of Wills, indicates that Mr. Gardner was appointed "successor conservator pursuant to the provisions of the D.C. Code 21-1501 et seq. (1981 [ed.]) of the estate of Edward T. Smith," notwithstanding that this statute had already been repealed by the time of Mr. Gardner's appointment and that this statute only applied to a person who was "unable, by reason of . . . mental weakness not amounting to unsoundness of mind, properly to care for his property." D.C. Code § 21-1501 (1981). Mr. Smith, of course, had been found to be "of unsound mind."[3]

On January 16, 2001, Mr. Gardner petitioned the court to terminate the conservatorship, representing that there were no additional assets to recover, Mr. Smith's VA benefits were being sent directly to the psychiatric facility in New York, and Mr. Gardner had been inactive since recovering certain assets for the estate. Ultimately, the court denied this request. It was not until April 7, 2009, that a hearing was held to "explore options to be taken by the conservator towards

---

[3] D.C. Code § 21-564 (b) provided that a person who had been hospitalized by "judicial decree" prior to September 15, 1964, "shall, upon the expiration of the one-year period immediately following September 15, 1964, be deemed to have been restored to legal capacity unless, within the one-year period, affirmative action is commenced to have the person adjudicated mentally incompetent by a court of competent jurisdiction." There is nothing in the record to indicate that the Superior Court took notice of this provision or considered Mr. Smith no longer to be of "unsound mind." Nor does the record reflect that any "affirmative action" was taken to have Mr. Smith once again "adjudicated mentally incompetent."

the possible termination or closure and potential transfer of this former law conservatorship proceeding to an Intervention (INT) or Supplemental Needs Trust (SNT) case type proceeding, including whether a guardian should be appointed for the ward." About a month later, another hearing was held, and Mr. Gardner was ordered to file a petition for intervention. On May 22, 2009, Mr. Gardner filed the petition with the Register of Wills and, according to Mr. Gardner, the petition was mailed to the ward at the nursing home in New York. Nevertheless, on July 30, 2009, the petition was dismissed because Mr. Smith had not been personally served. *See* D.C. Code § 21-2042.

### C. Mr. Gardner's New Appointment

On June 7, 2010, the court held a hearing to determine whether the conservatorship should be terminated. During this hearing, an Assistant Deputy Register of Wills explained that there was no evidence in the record "that there was ever a conservator for the person of the ward," and it was necessary to appoint a conservator of the person to make medical decisions on behalf of Mr. Smith. However, because personal service could not be obtained, a new intervention proceeding could not be initiated. This created a "conundrum." To ensure that the ward had a fiduciary to make medical decisions on his behalf, the deputy suggested

that the court issue "an order specifically appointing a conservator of the person" with the power to make full medical decisions on the ward's behalf.

At the conclusion of the hearing, Judge Kaye Christian explained that she would issue an order "appointing Mr. Gardner as the conservator of the person of Edward T. Smith" to make "decisions with respect to his daily care, medical decisions, and other decisions that are required for him to be made by a court-appointed fiduciary." On June 11, Judge Christian issued an order appointing Mr. Gardner "conservator of the person of Edward T. Smith, ward, with full legal powers to make medical decisions on the ward's behalf." The Certificate of Appointment issued on August 11, 2010, stated that this appointment had been made "pursuant to the provisions of D.C. Code, section 21-1506 et seq. (1967 ed.)," granting him "full legal powers to make medical decisions on behalf of the ward."

In January 2011 Judge Wertheim ordered that the conservatorship of the estate be terminated but "that the conservatorship of the person shall continue." That conservatorship of the person was effectively terminated when Mr. Smith died in 2013.

### D. Compensation

Under the 1951 law, a committee was entitled to receive "a reasonable compensation for services rendered by the committee not exceeding a commission of 5 per centum of the amounts collected if and when disbursed." D.C. Code § 21-301 (1951). This measure of compensation was not much different for conservators appointed under the 1967 and 1981 laws. *See* D.C. Code § 21-1503 (1967); *Mitchell v. Ensor*, 412 F.2d 155, 160 (D.C. Cir. 1969) (a five percent commission is permissible in determining reasonable compensation). Superior Court Probate Rule 225 states that "[c]ompensation to a conservator . . . for ordinary services shall be by commission which shall not exceed 5% of amounts disbursed from the estate."[4] When the Guardianship Act was enacted in 1987, it not only eliminated the percentage commission, but also established a fund for compensation. D.C. Code § 21-2060 provides:

> (a) As approved by order of the court, any visitor, attorney, examiner, conservator, special conservator, guardian ad litem, or guardian is entitled to compensation

---

[4] Subsections (c) and (e)(1) of Probate Rule 225 also permit additional compensation for "extraordinary services" by fiduciaries and for attorney fees, which may include "reasonable attorney's fees for preparing pleadings filed with the Court and for other necessary legal services rendered to the fiduciary in the administration of the estate."

for services rendered either in a guardianship proceeding, protective proceeding, or in connection with a guardianship or protective arrangement. . . . Compensation shall be paid from the estate of the ward or person or, if the estate of the ward or person will be depleted by payouts made under this subsection, from a fund established by the District.

(b) There is established within the General Fund of the District of Columbia a separate account to be known as the Guardianship Fund" ("Fund") and to be administered by the court. There is authorized to be appropriated funds necessary for the administration of this section.

Shortly after his appointment in 1998, Mr. Gardner recovered approximately seven thousand dollars which belonged to the ward's estate. Thereafter, Mr. Gardner filed a series of petitions for compensation. Two of these petitions were approved for the entire amounts requested and were paid from the ward's estate. However, when ruling on one such request, the court limited Mr. Gardner's compensation to a five percent commission on the disbursements that he made from the estate, plus related costs, an amount also paid from the ward's estate. *See* Super. Ct. Prob. R. 225 (a).

On August 11, 2011, Mr. Gardner petitioned the court for compensation for legal services rendered from June 7, 2010, through August 11, 2011. Because the ward no longer had any assets, Mr. Gardner requested that the compensation be

paid from the Guardianship Fund. *See* D.C. Code § 21-2060. Judge Wolf, relying on *Sullivan v. District of Columbia*, 829 A.2d 221 (D.C. 2003), and *In re Estate of Bryant*, 738 A.2d 283 (D.C. 1999), concluded that Mr. Gardner "may not be paid from the Guardianship Fund in an 'old law' case" and denied the petition without prejudice "to leave open to counsel to apply further if he can come up with a way to be lawfully paid." Judge Wolf noted that "[t]he court has attempted to convert old law cases to new law cases partly to prevent the apparent injustice to counsel evident here," but "[t]hat was not done successfully in this case, at least not yet."

Mr. Gardner filed two subsequent petitions requesting compensation, both of which were denied. In denying Mr. Gardner's amended petition for compensation for the period from April 7, 2009, through August 8, 2011, Judge Wolf stated that "[w]hile the court agrees with counsel's interpretation of *Estate of Bryant*, it cannot agree with counsel's other arguments to overcome *Sullivan v. D.C.*" (citations omitted).[5] Judge Wertheim denied Mr. Gardner's petition for compensation for the period from August 9, 2011, through June 22, 2012, "for the [same] reasons set forth in Judge Wolf's Orders entered Nov[ember] 17, 2011 and March 14, 2012." Mr. Gardner appeals from the denial of those two petitions, emphasizing that he

---

[5] In *Bryant*, we specifically pointed out that we were not deciding whether the Guardianship Act applied to "old law" cases. 738 A.2d at 284 n.2.

was appointed after § 21-1501 had been repealed.  Therefore, he argues, he was appointed pursuant to the "new law" and was eligible to receive compensation from the Guardianship Fund.[6]

## II.    Analysis

The introductory language of the Guardianship Act instructs that "[t]his chapter shall be liberally construed and applied to promote its underlying purposes and policies."  D.C. Code § 21-2001 (a).  However, "[n]othing in this chapter shall affect any guardian or conservator appointed by the court upon a petition filed prior to the effective date of this chapter."  D.C. Code § 21-2002 (c).  This latter provision does not necessarily apply to Mr. Gardner's appointment because, as we explain below, he was properly regarded as a successor committee, not a guardian or conservator.  Moreover, the crucial appointment in this case, occurring in 2010, did not occur "prior to the effective date of this chapter."

**A. Mr. Gardner's 1998 Appointment as Conservator of the Estate**

---

[6]    A third appeal (13-PR-1034) has been held in abeyance pending the outcome of these consolidated appeals.

Despite the language used by the Superior Court in naming Mr. Gardner conservator of the ward's estate in 1998, he might have been more aptly described as a successor committee. Mr. Perna had been appointed as a committee pursuant to § 21-301 of the 1951 law. In 1964, Congress repealed the statutes which authorized committeeships, but it provided a savings clause that stated "[n]othing in this subsection shall be construed to affect any action taken prior to the date of the enactment of this Act pursuant to any of the aforementioned subsections repealed by this subsection." 78 Stat. at 953-54. Thus, it left Mr. Perna's committeeship intact. When the law was amended in 1965 and again in 1981, § 21-564 (b) provided that in "cases in which a committee has heretofore been appointed and the committeeship has not been terminated by court action, such committee shall continue to act under the supervision of the [court] under its equity powers." Mr. Perna's committeeship was preserved notwithstanding the enactment of the 1981 laws.

When Ms. Taylor was appointed to replace Mr. Perna, she was effectively appointed as successor committee. She would have served under the same authority as Mr. Perna; no steps had been taken to have her appointed conservator (of the person or estate) under a different set of statutes. After Ms. Taylor's appointment was vacated for failure to post a surety bond, Mr. Gardner was

appointed to replace her, thereby becoming successor committee of the ward's estate. As a successor committee, Mr. Gardner would be ineligible to receive compensation from the Guardianship Fund; rather, according to the statutes in place at the time of Mr. Perna's appointment, Mr. Gardner would only be eligible to receive a five percent commission from the funds available in the ward's estate. D.C. Code § 21-301 (1951).

Probate Rule 225 is sometimes cited as an additional restriction on compensation in "old law" cases. The commentary warns that "[n]o compensation shall be awarded for supervision of a ward's person." It goes on to say that "[c]onservators and guardians serve as officers of the Court. There can be no assurance in any given case that a fiduciary will receive compensation or commission which the fiduciary considers adequate." For reasons explained below, we do not think this rule precludes compensation for services performed after the 2010 appointment.

Superior Court Probate Rule 1 (d) states that Rules "201 through 212 shall govern all proceedings instituted in the Probate Division of the Court involving guardians of minors' estates or custodians of minors, conservators appointed in proceedings filed before September 30, 1989, committees, and trustees." The

referenced rules are procedural in nature, and Rule 1 does not mention Rule 225, which applies to the compensation of guardians of minors and conservators appointed before 1989. Moreover, Rule 225 itself does not mention the compensation of committees. Nevertheless, the "spirit" of the rule may preclude compensation from the Guardianship Fund for services performed as a successor committee.

## B. Mr. Gardner's 2010 Appointment as Conservator of the Person

Although our decision in *Sullivan* is instructive, it does not clearly preclude an award of compensation from the Guardianship Fund for the services Mr. Gardner rendered as conservator of the person after his 2010 appointment. The issue in *Sullivan* was whether the services rendered by the guardian *ad litem*, who was appointed pursuant to Super. Ct. Civ. R. 17 (c) but after the enactment of the "new law," were of the type compensable from the Guardianship Fund. *Sullivan*, 829 A.2d at 224. We concluded that counsel's service as guardian *ad litem* to "ascertain information concerning [plaintiff's] mental condition" and provide legal services to the plaintiff in two civil lawsuits was not compensable from the Guardianship Fund because only a qualified examiner could have assessed plaintiff's mental condition and the civil suits were not among the types

of proceedings for which a guardian *ad litem* could be appointed and compensated under the Guardianship Act. *Id.* at 226. The case thus is factually distinguishable.

However, in *Sullivan* we did endorse two principles that must guide our analysis of the instant case. In order to receive compensation from the Guardianship Fund, the appointment must have been made pursuant to the Guardianship Act, and the appointee must have performed duties consistent with his or her role as specified by the Act. *Id.* In other words, the appointment and compensation is limited to only "specific types of proceedings." *Id.*

It is not clear that the court assigned Mr. Gardner the proper title because the Guardianship Act does not provide for a "conservator of the person," and conservators appointed under that Act manage the estate of a protected individual. *See* D.C. Code §§ 21-2051 to -2077. Nevertheless, at least some of the duties performed by Mr. Gardner after the 2010 appointment appear to be those of a guardian. The Guardianship Act provides that a "guardian of an incapacitated individual is responsible for care, custody, and control of the ward." D.C. Code § 21-2047. Examples of such duties include:

> (1) Becom[ing] or remain[ing] personally acquainted with the ward and maintain[ing] sufficient contact with

the ward to know of the ward's capacities, limitations, needs, opportunities, and physical and mental health; . . . (5) Report[ing] in writing the condition of the ward and of the ward's estate that has been subject to the guardian's possession or control, as ordered by the court on petition of any person interested in the ward's welfare or on any order of the court, but at least semiannually; (6) Mak[ing] decisions on behalf of the ward by conforming as closely as possible to a standard of substituted judgment or, if the ward's wishes are unknown and remain unknown after reasonable efforts to discern them, make the decision on the basis of the ward's best interests.

D.C. Code § 21-2047 (a).

After the court appointed Mr. Gardner conservator of the person, his records reflect that he made seven trips to New York to visit Mr. Smith from November 2010 to August 2011 to determine Mr. Smith's needs and medical condition in order to make informed medical decisions on the ward's behalf. This is consistent with the duties of a guardian. In addition, he continued to prepare and file reports and accountings and corresponded with the social worker overseeing Mr. Smith's care. Therefore, at least some of the duties Mr. Gardner performed fall into the category of those defined in the Guardianship Act, satisfying the second principle identified in *Sullivan*.

Turning to the first principle described in *Sullivan*, it is less clear that Mr. Gardner's appointment was made under the authority of the Guardianship Act. The court did not identify its legal basis for making the appointment. The Certificate of Appointment stated that the appointment had been made pursuant to § 21-1506 (1967), a law which was no longer in effect and apparently was inapplicable because it only applied to persons "with mental weakness not amounting to unsoundness of mind."[7] Previous statutes were also inapplicable to this appointment because the old guardianship statutes generally did not apply to adults, and the old conservatorship statutes, in addition to being inappropriate for managing those of "unsound mind," were primarily reserved for the maintenance of the estate, not of the person. D.C. Code §§ 21-101 to -182, -1501, -1503.

The only apparent authority available in 2010 for appointing a "conservator of the person" (more aptly, a guardian) for Mr. Smith was the Guardianship Act. Both the trial court and the Assistant Deputy Register of Wills seemed to believe that Mr. Gardner needed to have additional authority. Perhaps this appointment

---

[7] It is uncontested that Mr. Smith was civilly committed in 1958 because he had been diagnosed with chronic schizophrenia (undifferentiated type), which led to the decree that he was of "unsound mind." Mr. Gardner's reports indicate that Mr. Smith continued to "suffer[] from NSC schizophrenia" in 2013.

was not legally pristine because the intervention petition had been dismissed.[8] However, Mr. Smith was already a ward of the court, and the Assistant Deputy Register of Wills had orally requested the appointment of a conservator of the person with authority to make medical decisions. Thereafter, Mr. Gardner acted in good faith under the directives of the court to carry out his duties as, in effect, Mr. Smith's guardian.

Technical flaws in an appointment of this type are addressed by our decision in *Orshansky*, where this court said that "whether a fiduciary appointed by the probate court is due compensation from the subject's estate under the Guardianship Act does not depend on whether the probate court's appointment was in error. Service in good faith pursuant to court order is compensable, regardless of whether the probate court erred in making the appointment." *In re Orshansky*, 952 A.2d 199, 210 (D.C. 2008). If the payout for the services rendered would deplete the estate, "payment is made from the Guardianship Fund." *Id*.

We therefore conclude that Mr. Gardner's 2010 appointment as conservator of the person is properly construed to have been made pursuant to the

---

[8] In addition, one might reasonably ask whether such an appointment should have been sought in New York, where Mr. Smith had resided for some time. *See* D.C. Code § 21-2021 (territorial application of Guardianship Act).

Guardianship Act. Thus, if there are no longer funds available in the ward's estate to compensate Mr. Gardner, he is *eligible* to receive compensation from the Guardianship Fund for services rendered after his appointment in 2010 as conservator of the person. Such payment would be entirely consistent with the purposes for which the Guardianship Fund was established. That of course does not mean that Mr. Gardner is *entitled* to compensation from the Fund in the amounts requested, but this is a question for the trial court to answer. *See District of Columbia Metro. Police Dep't v. Stanley*, 951 A.2d 65, 67 (D.C. 2008) ("[F]ee petitions raise factual questions . . . [and] should presumptively be addressed first at the trial court level.").

Our study of this record raises many questions about whether the mental status of Mr. Smith should have been reexamined over the years and whether the new appointment of Mr. Gardner was accomplished without regard to many procedural requirements of the Guardianship Act. See notes 3 and 8, *supra*. However, no one has questioned whether Mr. Smith's rights were honored, and any such issues have been mooted by his death. Therefore, we have addressed only the question presented to us.

### III.    Conclusion

The judgments on appeal are hereby reversed, and these cases are remanded to the Superior Court with instructions to consider the petitions for compensation anew and determine whether Mr. Gardner is entitled to payment from the Guardianship Fund for the various services he provided following his appointment as conservator of the person in 2010.

*It is so ordered.*